THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MICHAEL G.,**

        **Plaintiff,**

v.                                      Civil Action 2:21-cv-5467
                                            Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## OPINION AND ORDER

Plaintiff, Michael G., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 8, 10). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 11) and **AFFIRMS** the Commissioner's decision.

**I.**     **BACKGROUND**

Plaintiff filed his application for SSI on September 26, 2018, alleging that he was disabled beginning January 1, 2018, due to degenerative disc disease in the cervical spine, bilateral hand tingling and numbness, chronic headaches, arthritis in the bilateral knees, a torn meniscus surgery, sleep apnea, high blood pressure, stage III kidney disease, and stomach problems. (Tr. 202–10, 238). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on September 2, 2020. (Tr. 77–112). The ALJ denied benefits in a written decision on November 12, 2020. (Tr. 55–75). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on November 23, 2021 (Doc. 1), and the Commissioner filed the administrative record on January 26, 2022 (Doc. 9). The matter has been briefed and is ripe for consideration. (Docs. 11, 14, 15).

**A.  Relevant Statements to the Agency and Hearing Testimony**

The ALJ summarized Plaintiff's statements to the agency and the testimony from Plaintiff's hearing as follows:

> \*\*\*  At the time he applied for benefits, [Plaintiff] was 6'2" tall and weighed 260 pounds (Exhibit 2E/2). In a February 2019 report of contact, [Plaintiff] stated his doctors told him he was too young for a knee replacement (Exhibit 1A/3). Despite his complaints, he reported that he was able to lift up to forty pounds (Exhibit 1A/3). On his initial appeal, [Plaintiff] stated he was unable to sit or stand too long because of degenerative disc disease in the neck, and his knees made it difficult to walk, crouch, and climb stairs (Exhibit 5E/5).  \*\*\* In a June 2019 report of contact, [Plaintiff] stated that his hand numbness and tingling was because of his neck, and he was dropping things and losing his grip (Exhibit 3A/5). He was only seeing his primary care provider and participating in physical therapy (Exhibit 3A/5). He stated that when his knee pain gets "really bad," he will get a cortisone shot from his orthopedic specialist (Exhibit 3A/5). He reported he was told to take Tylenol and ibuprofen, but he stated that it caused kidney problems (Exhibit 3A/5). At his hearing, [Plaintiff] testified that his neck gets stiff and painful if he stands or sits too long, and he then gets bad headaches. He got frustrated because he cannot do what he used to do, and he was very aggravated. He had to walk up stairs sideways and had difficulty bending over. He was able to get down, but he needed to find something to help him up. Getting dressed was difficult because he had to put one leg into his pants, stand up, and situate himself to get his other leg in. He reported his cane was prescribed, and he was using a walking stick for about four months. [Plaintiff] reported that he had recently been approved for a second gel shot to cushion his left knee, which was bone to bone. He indicated he had a couple of falls because of turning his knee wrong, and everything was creaking and popping, causing him to move slowly. He stated that he slept only three to four hours per night, and he took naps during the day. He reported that he had carpal tunnel in both hands, and he was given braces to wear at night. He noted that surgery was recommended, but he also indicated that his doctor stated the symptoms, including dropping things, may be caused by his neck pain. He reported carpal tunnel symptoms daily.  \*\*\* He was able to do small things in or outside his house, and he was able to do artwork and painting despite his hand complaints. He was able to cook and shop for himself, though he used riding carts at the store. [Plaintiff] testified that he was able to lift ten to fifteen pounds. He further testified that he was able to sit and stand for about one and a half hours each, which is consistent

with an ability to meet light sitting and standing requirements when given the option to alternate between sitting and standing.

(Tr. 62–63).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records as follows:

\*\*\* In July 2017, [Plaintiff] was referred to neurosurgery for his chronic neck pain, where he was told he had degenerative spondylosis without any further recommendations (Exhibit 1F/56). A November 2017 x-ray of the lumbar spine showed no acute osseous abnormalities (Exhibit 1F/89). He had minimal endplate spurring with only mild facet arthritis bilaterally at L5-S1 (Exhibit 1F/89). His cervical x-ray showed no acute osseous abnormalities, though he had some degenerative changes at C5-6 and C6-7 that were similar to prior studies (Exhibit 1F/88). In January 2018, [Plaintiff] denied any weakness in the bilateral upper extremities (Exhibit 1F/44). In February 2018, only two weeks after undergoing knee surgery, [Plaintiff] returned to work despite his neck complaints (Exhibit 1F/40). February 2018 primary care notes show complaints of progressively worsening cervical pain with some radiation into the bilateral upper extremities and some associated intermittent numbness, paresthesias, and pins and needles (Exhibit 1F/36). He stated his neck pain caused headaches that frequently cause some flashing lights in his vision (Exhibit 1F/36). He only tried Tylenol for his pain (Exhibit 1F/36). His primary care provider described him as "very physical," and he worked as a construction worker and with auto body repair (Exhibit 1F/36). His March 2018 cervical MRI showed degenerative disc disease and spondylosis that is greatest at C5-C6 and C6-C7 with bilateral foraminal narrowing that was greatest on the right at C5-C6, where there was moderate to severe stenosis (Exhibit 1F/71). That month, [Plaintiff] saw neurology, where he presented with full 5/5 strength in the bilateral upper extremities (Exhibit 1F/31). Gait was steady and smooth, Romberg's and Hoffman's testing were negative, rapid repetitive movements were within normal limits, and sensation was intact (Exhibit 1F/31). That month, he told his primary care provider that he did not always take his gabapentin as prescribed because it made him fatigued (Exhibit 1F/27). In April 2018, [Plaintiff] began participating in physical therapy (Exhibit 1F/22). On examination, strength in the lower and middle traps were reduced bilaterally, right worse than left, but the remainder of his strength throughout the bilateral upper extremities was relatively good (Exhibit 1F/24-25). Grip strength was good (Exhibit 1F/25). He had some reduced range of motion in the neck (Exhibit 1F/25). Physical therapy was recommended one to two times per week for four to six weeks, and he was to complete his home exercise program two to three times per day (Exhibit 1F/26). On his second visit, [Plaintiff] reported doing a little better with less pain (Exhibit 1F/22). Despite reporting some improvement, there are no records of further visits (Exhibits 1F-8F). May 2018 neurology notes indicate that his prior MRI only had mild to moderate spondylitic changes and stenosis at multiple levels, but there was

no significant cord compression (Exhibit 1F/21). He was not a candidate for surgical intervention, and he was advised to aggressively participate in physical therapy for two to three months (Exhibit 1F/21). He was also advised to invest in a cervical traction collar that he can buy online (Exhibit 1F/21). If those treatments did not work, they would refer him to pain management for injections (Exhibit 1F/21). However, there is no indication that [Plaintiff] resumed physical therapy until June 2019 (Exhibits 1F-8F).

\*\*\*

In September 2018, [Plaintiff] complained of peripheral neuropathy due to cervical degenerative disc disease (Exhibit 1F/11). He did not drop tools, but his hands hurt all the time (Exhibit 1F/11). In December 2018, [Plaintiff] reported he was considering surgery for his cervical radiculopathy (Exhibit 1F/6). He stated his pain was worsening, and he had pins and needles in his hands that were worsening (Exhibit 1F/6). However, he reported he was not dropping things or losing strength (Exhibit 1F/6). He indicated his right elbow hurt, but he had no range of motion issues and was able to perform repetitive movements at work (Exhibit 1F/6). On examination, he had good range of motion in all extremities and no joint tenderness to palpation except for mild tenderness to the medial aspect of the right elbow (Exhibit 1F/7). He had full 5/5 motor function and sensory function with no focal deficits (Exhibit 1F/7). In June 2019, [Plaintiff] participated in another physical therapy evaluation for his neck complaints, though he also noted pain in the bilateral shoulders, right medial elbow, low back, and left knee (Exhibit 3F/3). He stated he had numbness and tingling to the bilateral hands almost constantly that increased with activity, and he also reported intermittent numbness in his feet (Exhibit 3F/3). He stated he frequently dropped things when his hands went numb (Exhibit 3F/3). On examination, strength was relatively good throughout the bilateral upper extremities, ranging from 4-/5 to 5/5 in all muscle groups except for the lower traps (Exhibit 3F/6-7). Upper extremity range of motion was within functional limits, though neck range of motion was reduced (Exhibit 3F/6-7). His distraction test was positive for a decrease of symptoms (Exhibit 3F/7). Physical therapy was recommended one to two times per week, and he was to perform his home exercise program two to three times per day (Exhibit 3F/8). At his third visit, almost a month after starting physical therapy, [Plaintiff] denied being compliant with his home exercise program with any consistency (Exhibit 4F/180). He reported only working on scapula retraction (Exhibit 4F/180). He continued to work as a mechanic and stated his neck felt better when he was working, as it stayed looser (Exhibit 4F/180). While he had only met one short-term goal and one long-term goal by his third visit, the physical therapy felt it was appropriate to discharge him to his home exercise program (Exhibit 4F/181). In August 2019, [Plaintiff] received C7-T1 epidural steroid injections (Exhibit 4F/169). He told his primary care provider that he was not dropping things despite his pain (Exhibit 6F/59). As such, his functioning on examinations still does not support symptoms or limitations as severe as alleged, particularly considering his conservative treatment and limited participation in physical therapy.

4

He received another round of C7-T1 epidural steroid injections in November 2019 (Exhibit 4F/154). His pain management notes reflect that his August injections provided 40-50% relief, which was enough to make him want another injection (Exhibit 4F/151). On average, his pain was 5/10, but it ranged from 0-8/10 (Exhibit 4F/151). He was able to sit, stand, and walk for thirty minutes each without pain, and he was able to lift fifteen pounds without pain (Exhibit 4F/151). On examination, sensation was intact in the bilateral upper extremities (Exhibit 4F/151). He had full 5/5 strength in the bilateral upper extremities, including with respect to grip strength, and his gait was normal (Exhibit 4F/152). At his follow-up with pain management the next month, he reported 90% pain control in the neck (Exhibit 4F/11). Sitting improved to an hour without pain (Exhibit 4F/11). He was "very satisfied" with the pain control from the injections, but he still complained of weakness in both hands with dropping things (Exhibit 4F/11). He also complained of bilateral lumbar pain that did not radiate, and there was no associated paresthesias or weakness (Exhibit 4F/11). On examination, sensation was intact to light touch in the bilateral lower extremities (Exhibit 4F/12). Strength was a full 5/5 throughout the bilateral lower extremities (Exhibit 4F/12). Straight leg raising was negative bilaterally (Exhibit 4F/12). Gait and station were normal, and he was able to toe walk, heel walk, and tandem gait (Exhibit 4F/12). In December 2019, [Plaintiff] received bilateral L4-5 and L5-1 facet joint injections due to his facet arthropathy (Exhibit 4F/136). At his follow-up in January 2020, he reported that the facet joint injections provided 75% pain control (Exhibit 5F/16). A May 2020 MRI of the cervical spine redemonstrated cervical spondylosis at C5-6 and C6-7 that appeared unchanged from the prior study (Exhibit 4F/131). While there was some foraminal narrowing, there was no significant central stenosis or cord compression to explain his symptoms (Exhibit 4F/131). His neurologist reviewed the MRI and confirmed there was no overt compression of neural elements (Exhibit 5F/9). His neurosurgeon noted that they could considered an anterior cervical discectomy and fusion at C5-6 and C6-7, but he was informed that a complete resolution of pain was an unrealistic goal (Exhibit 5F/9).

\*\*\*

[Plaintiff] has a longstanding history of knee complaints, particularly in the left knee, but the record is not consistent with symptoms or limitations as severe as alleged. Records dating to at least May 2017 show complaints of left knee pain (Exhibit 1F/60). He was requesting cortisone injections for both knees despite having full range of motion in the bilateral knees (Exhibit 1F/60). He stated he had not lost strength, and he felt stiff at the end of the day (Exhibit 1F/60). He indicated he did not have time for surgery (Exhibit 1F/60). He had a tear of the medial meniscus of the left knee with bilateral tricompartmental chondromalacia (Exhibit 1F/62). July 2017 primary care notes show that he was receiving conservative treatment pain management for his knee (Exhibit 1F/56). December 2017 orthopedic notes show that he did not require any ambulatory aids to get around (Exhibit 1F/46). On examination, he had a normal gait despite some tenderness

and slightly reduced range of motion in the knee (Exhibit 1F/48). In January 2018, [Plaintiff] underwent an arthroscopic partial medial [meniscectomy], chondroplasty of the patella, and chondroplasty of the medial femoral condyle to address a horizontal tear in the posterior horn of the medial meniscus and his grade 2 chondromalacia (Exhibits 1F/40 and 4F/244). At his two-week follow-up, he was only taking as needed Tylenol for his knee ache (Exhibit 1F/40). He was not using any ambulatory support, and he was already back to work (Exhibit 1F/40). On examination, he only had a slight limp with expected swelling about the knee and only slightly reduced range of motion (Exhibit 1F/40). His primary care provider described him as "very physical," and he worked as a construction worker and with auto body repair (Exhibit 1F/36). March 2018 neurology notes reflect that gait was steady and smooth, Romberg's and Hoffman's testing were negative, rapid repetitive movements were within normal limits, and sensation was intact (Exhibit 1F/31). In September 2018, he told his orthopedic specialist that his pain in his knee was worse lately and hindering his job (Exhibit 1F/8). On examination, there was some tenderness, but the knee was stable with normal range of motion (Exhibit 1F/9).

In November 2019, [Plaintiff] reported that he was able to sit, stand, and walk for thirty minutes each without pain, and he was able to lift fifteen pounds without pain (Exhibit 4F/151). That month, [Plaintiff] saw his orthopedist, reporting that the September 2018 injections in his knee helped a lot, but the pain was slowly returning (Exhibit 7F/23). His November 2019 appointment was his first orthopedic appointment in over a year (Exhibit 7F/23). On examination, he did not have a limp, and strength was adequate at 4/5 (Exhibit 7F/27). His x[-]rays showed medial joint space narrowing without significant osteophyte formation, though there was a small traction osteophyte noted at the proximal pole of the patella (Exhibit 7F/27). His exam was consistent with an arthritis flare (Exhibit 7F/27). He received another injection (Exhibit 7F/28). December 2019 neurology notes reflect that gait and station were normal, and he was able to toe walk, heel walk, and tandem gait (Exhibit 4F/12). Strength was a full 5/5 throughout the bilateral lower extremities (Exhibit 4F/12). Despite his relatively normal examinations, [Plaintiff]'s provider gave him a cane to aid in mobilization due to his complaints in March 2020 (Exhibit 6F/49). However, none of his records reflect that he was actually using his cane (Exhibits 1F-8F). June 2020 orthopedic notes show complaints of numbness and tingling in the lower extremities (Exhibit 7F/11). He described his knee pain as constant and moderate to severe, and he had intermittent clicking and locking in the knee (Exhibit 7F/11). Steroid injections provided temporary relief (Exhibit 7F/11). On examination, he had a limp, but it does not mention the use of an assistive device (Exhibit 7F/15). Strength was adequate at 4/5 (Exhibit 7F/15). An August 2020 x-ray of the bilateral knees showed no acute osseous abnormality (Exhibit 8F/2). He had only mild medial and patellofemoral compartment osteoarthritis of the bilateral knees with a small joint effusion (Exhibit 8F/2-3).

(Tr. 63–67).

6

When discussing the medical source opinions, the ALJ found:

The opinions of Drs. Gerald Klyop and Dimitri Teague, non-examining physicians with the Division of Disability Determination (DDD), are somewhat persuasive (Exhibits 1A and 3A).  Drs. Klyop and Teague opined [Plaintiff] was able to perform a reduced range of light work with mostly occasional postural activities (Exhibits 1A and 3A).  The opinions of Drs. Klyop and Teague are somewhat persuasive (Exhibits 1F-8F).  Throughout the record, [Plaintiff] generally presents with adequate physical functioning with respect to strength and gait, and those findings support light work (e.g. Exhibits 1F/25, 31, 48; 3F/6-7; 4F/12, 152; 7F/15, 27).  The generally mild findings on postsurgical imaging studies of the knee further support light work (e.g. Exhibit 8F/2-3).  Furthermore, despite his complaints, he reported that he was able to lift up to forty pounds in February 2019 (Exhibit 1A/3).  [Plaintiff] testified that he was able to lift ten to fifteen pounds.  He further testified that he was able to sit and stand for about one and a half hours each, which is consistent with an ability to meet light sitting and standing requirements when given the option to alternate between sitting and standing.  As such, when giving [Plaintiff] the full benefit of the doubt, the undersigned added said option to alternate between sitting and standing based on his subjective complaints, and the ability to use a cane was added due to recent prescription despite his relatively good functioning.  The undersigned also added environmental restrictions based on [Plaintiff]'s sporadic respiratory complaints, and manipulative limitations were added to fully accommodate the subjective complaints related to his cervical degenerative disc disease with radiculopathy and recent, and therefore nonsevere, diagnosis of carpal tunnel syndrome.  Thus, the opinions of Drs. Klyop and Teague are only somewhat persuasive.

(Tr. 68–69).

### C.  The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful employment since September 26, 2018.  (Tr. 60).  The ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease of the lumbar and cervical spine, osteoarthritis of the knees, hypertension, obstructive sleep apnea, stage III chronic kidney disease, and obesity.  (*Id.*).  The ALJ, however, found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 61).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ found that:

After careful consideration of the entire record, the [ALJ] finds that [Plaintiff] has

7

>the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with lifting and/or carrying up to twenty pounds occasionally and ten pounds frequently. He is able to stand and/or walk for about six hours and sit for about six hours in an eight-hour workday, but he would be permitted to alternate between sitting and standing every hour while at the workstation. He would also be permitted to use a single point cane. The claimant is limited to no climbing of ladders, ropes, or scaffolds with occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs. He is able to frequently handle, finger, feel, and reach overhead with the bilateral upper extremities. He is limited to occasional exposure to dust, odors, fumes, and pulmonary irritants, and he should avoid unprotected heights.

(Tr. 62).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 63).

Plaintiff has no past relevant work. (Tr. 69). Relying on the vocational expert's testimony, the ALJ concluded that considering his age, education, work experience, and the above RFC, Plaintiff could perform jobs that exist in significant numbers in the national economy, such as a merchandise marker, cashier, and inspector and hand packager. (Tr. 70). He therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, at any time since September 26, 2018. (Tr. 71).

**II.      STANDARD OF REVIEW**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

In his Statement of Errors, Plaintiff contends that: (1) the RFC determination is not supported by substantial evidence and (2) the ALJ relied on flawed testimony from the vocational expert ("VE") at step five of the sequential analysis. (Doc. 11 at 5–9). Particularly, Plaintiff says the ALJ unreasonably concluded that he had the ability to stand and/or walk for six hours in an eight-hour workday and to frequently handle, finger, feel, and reach overhead with the bilateral upper extremities. (*Id.* at 5). He further says the VE's testimony was inconsistent so the ALJ erred in relying on it. (*Id.* at 6–7). The Commissioner counters that substantial evidence supports the ALJ's RFC determination. (*See generally* Doc. 14). The Court agrees and finds Plaintiff's assignments of error without merit.

#### A. RFC Determination

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id*. The governing regulations describe five

9

different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. § 416.913(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. 20 C.F.R. § 416.920c(b)(2). And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id*. If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [he or she] considered the other most persuasive factors . . . ." 20 C.F.R. § 416.920c(b)(3).

Plaintiff maintains "[t]he ALJ unreasonably translated [the objective medical evidence] to

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 416.913(a)(2), (5).

10

mean that [Plaintiff] can frequently use his hands and reach overhead in addition to standing and walking up to six hours each workday." (Doc. 11 at 8–9). First, regarding the standing and walking capability, Plaintiff cites few medical records. Particularly, he notes that: David F. Lim prescribed him a handicap placard due to knee osteoarthritis (*id.* at 7) (citing Tr. 307, 403, 426); a November 2019 x-ray showed medical joint space narrowing in his left knee (*id.*) (citing Tr. 996); and that he was prescribed a walking cane in March 2020 (*id.*) (citing Tr. 426, 811). The ALJ, however, thoroughly reviewed the medical records related to Plaintiff's "longstanding history of knee complaints, particularly in the left knee," but found that "the record is not consistent with symptoms or limitations as severe as alleged." (Tr. 66).

Specifically, the ALJ noted that in December 2017, March 2018, November 2019, and December 2019, Plaintiff demonstrated a normal gait upon examination. (Tr. 66) (citing Tr. 337, 320, 996, 435). While there were two other occasions, in January 2018 and June 2020, where Plaintiff showed a slight limp, he did not require an assistive device to walk. (Tr. 66–67) (citing Tr. 329, 984). The ALJ also identified several examinations throughout 2019 and 2020 at which Plaintiff exhibited 4 or 5 out of 5 strength in his bilateral lower extremities. (*Id.*) (citing Tr. 996, 435, 984). And though Plaintiff underwent knee surgery early in January 2018, he returned to work within two weeks without ambulatory support and was taking Tylenol only as needed for pain. (Tr. 66) (citing Tr. 329). Generally, most of Plaintiff's pain management was conservative, often involving the use of topical gel, Tylenol, and steroid injections (Tr. 66–67) (citing Tr. 345, 997, 980).

The ALJ also reviewed reports of x-rays on Plaintiff's knees, which he noted "showed medial joint space narrowing without significant osteophyte formation," and "no acute osseous abnormality" with "only mild medial and patellofemoral compartment osteoarthritis of the bilateral

11

knees with a small joint effusion." (*Id.*) (citing Tr. 996, 1021–22). Finally, "[d]espite his relatively normal examinations," Plaintiff was given a cane to aid in mobilization by one of his providers in March 2020—but the ALJ found no records reflecting that Plaintiff was using the cane. (*Id.*) (citing Tr. 811).

Notably, both state agency physicians, whose opinions the ALJ found "somewhat persuasive" (Tr. 68), concluded that Plaintiff could stand and/or walk for six hours out of an eight-hour workday (Tr. 118, 129). However, in view of the foregoing evidence, and giving "full benefit of the doubt" to Plaintiff's own testimony that he was able to sit for about an half and hour before he needed to stand, and vice versa, the ALJ added into the RFC the "option to alternate between sitting and standing based on [Plaintiff's] subjective complaints, and the ability to use a cane . . . ." (Tr. 69, 90). Regarding Plaintiff's ability to stand and/or walk up to six hours, the ALJ's decision is supported by substantial evidence.

Next, Plaintiff challenges the manipulative limitations included in his RFC, which found that he was "able to frequently handle, finger, feel, and reach overhead with the bilateral upper extremities." (Tr. 62). "Frequent means occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251 at *6 (Jan. 1, 1983). Plaintiff says this finding is "unreasonable in light of the objective medical evidence," particularly considering evidence of bilateral carpal tunnel syndrome that was not available to the state agency physicians. (Doc. 11 at 7–9).

The ALJ thoroughly considered Plaintiff's manipulative capabilities as they relate to his cervical degenerative disc disease. He particularly noted a consistent history that Plaintiff had full or good strength in his bilateral upper extremities upon examination. (Tr. 63–65) (citing Tr. 320, 313–14, 296, 419–20, 575). Similarly, neither state agency physician opined that Plaintiff had manipulative limitations. (Tr. 119, 130). Yet, as Plaintiff identifies, later evidence of his carpal

12

tunnel syndrome was not available to the state agency doctors.

Indeed, the final state agency opinion was dated July 28, 2019 (Tr. 130), and the ALJ identified that "March 2020 records are the first to reflect that [Plaintiff] had moderate to severe bilateral carpal tunnel syndrome according to a recent EMG, though the actual EMG report was not in the record." (Tr. 61) (citing Tr. 807). The ALJ further noted that Plaintiff was not compliant with recommended use of wrist splints, his provider gave him additional wrist splints, and there was no evidence of more aggressive treatment in the record. (*Id.*) (citing Tr. 807, 811). Ultimately, to accommodate Plaintiff's "subjective complaints related his cervical degenerative disc disease with radiculopathy and recent, and therefore nonsevere, diagnosis of carpal tunnel syndrome[,]" the ALJ included manipulative limitations in the RFC, limiting Plaintiff to work that required only frequent use of his hands. (Tr. 69). This too was supported by substantial evidence.

Plaintiff briefly questions the ALJ's ability to review the evidence related to carpal tunnel syndrome given that it was not reviewed by state agency physicians. In support, Plaintiff notes that an ALJ is "not qualified to interpret raw medical data in functional terms." (Doc. 11 at 8) (collecting cases). But the ALJ did not interpret raw medical data. Rather, the ALJ reviewed the report of an internal medicine doctor. (Tr. 807–12). The only raw medical data—the EMG—was read and interpreted by the doctor in his report. *See, e.g.*, *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726–27 (6th Cir. 2013) (finding no error where ALJ relied on radiologist's interpretation of x-rays without the further assistance of a medical expert, stating that while the x-rays were raw medical data, the radiologist's report was not). In fact, the EMG was not itself included in the report, so the ALJ relied solely on the doctor's interpretation.

Finally, the Court notes that Plaintiff seems to raise, without elaboration, an argument that the frequent use of hands limitation and the use of cane limitation are incompatible with one

another, and the RFC is inherently illogical. (Doc. 11 at 5) ("How is [Plaintiff] expected to perform work as a cashier or inspector and hand packer while standing for an hour at a time with the assistance of a cane before he is permitted to sit down again? The ALJ's RFC is illogical . . . .") (emphasis and citation omitted). The Court, however, finds no incompatibility in the RFC.

Particularly, the testimony elicited from the VE by the ALJ and Plaintiff's attorney supports that Plaintiff could perform work with those simultaneous limitations. The ALJ first presented the VE with a hypothetical individual who had, among other limitations, the manipulative limitation to "frequently handle, finger, and feel bilaterally[,]" and "frequently reach overhead bilaterally." (Tr. 103). The VE testified that such an individual could perform the jobs of Merchandise Marker, Cashier II, and Inspector and Hand Packager. (Tr. 104). The ALJ then used the same hypothetical, adding that the individual would be allowed to alternate between sitting and standing every hour while at his workstation. (*Id.*). The VE testified that the individual could still work in the same jobs, though at reduced numbers. (Tr. 104–05).

Later, Plaintiff's attorney asked the VE, "If an individual needed to use a cane for ambulation and balance, how would that affect their ability to perform light level work?" (Tr. 106–07). The VE answered that the individual would still be able to perform the jobs at the numbers she cited in the second hypothetical posed to her by the ALJ. In other words, she testified that an individual with an RFC to frequently use his hands, to alternate between sitting and standing every hour, and to use a cane, could perform the jobs of Merchandise Marker, Cashier II, and Inspector and Hand Packager. So the combination of limitations in the RFC which Plaintiff finds illogical were actually supported by the VE's testimony, which itself was based on the VE's knowledge, skill, and experience. Plaintiff provides no reason to doubt the VE's testimony in this regard. Nor does the Court find one.

In sum, the ALJ considered the entire record, including the medical treatment and findings, the state agency assessments, and Plaintiff's reported activities, to formulate the RFC finding. Substantial evidence supports the ALJ's decision, and this Court will not disturb it. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").

**B. Step Five**

In his second assignment of error, Plaintiff alleges that the ALJ failed to carry his burden at step five of the sequential analysis to show that Plaintiff had the vocational qualifications to perform specific jobs. (Doc. 11 at 5). Particularly, Plaintiff says that the VE's testimony that the jobs Plaintiff could perform allow an individual to "primarily sit" throughout the day are inconsistent with the ALJ's RFC determination that Plaintiff could stand and/or walk for six hours in an eight-hour workday, and with the regulations defining light work. (*Id.* at 6–7).

At step five of an ALJ's sequential analysis, the ALJ determines whether the claimant, based on the claimant's residual functional capacity and vocational factors (such as age, education, and work experience), can "make an adjustment to other work." 20 C.F.R. § 404.1520(g)(1). Although the claimant "bears the burden of proof during the first four steps, . . . the burden then shifts to the Commissioner at step five." *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 469 (6th Cir. 2017) (quotation marks and citations omitted omitted). To satisfy that burden, "the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Id*. (quotation marks and citation omitted omitted). In doing so, the ALJ may "take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). The

15

Dictionary of Occupational Titles ("DOT") "is one such publication upon which an ALJ may rely." *Springer v. Comm'r of Soc. Sec.*, 451 F. Supp. 3d 744, 765 (E.D. Mich. 2020) (citation omitted). "The ALJ may also seek the views of [a VE], who may present evidence that includes information from outside the DOT, including other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling." *Id*. (quotation marks and citations omitted). At base, the Court must be able to engage in a "meaningful review" of the ALJ's decision. *Moyers v. Colvin*, No. 3:13-0959, 2015 WL 1013992, at *21 (M.D. Tenn. Mar. 9, 2015*), report and recommendation adopted*, No. 3:13-cv-0959, 2015 WL 1467178 (M.D. Tenn. Mar. 30, 2015).

As described above, the ALJ carefully presented hypotheticals to the VE. When Plaintiff's attorney questioned the VE about the use of a cane in conjunction with the other hypothetical limitations, the VE stated it would not affect her previous statements about the numbers of jobs available to Plaintiff, and elaborated that: "The numbers I gave allow for a hypothetical individual to primarily sit throughout the duration of the day if they wanted to but they could stand at their work station as well." (Tr. 107). The testimony is not inconsistent with the RFC determination, as Plaintiff argues. Rather, it underscores that the jobs identified by the VE allow for flexibility in positioning; an employee could primarily sit, or primarily stand, based on the individual's preference. And the individual could alternate between positions often, at least every hour. (Tr. 104–105). This is perfectly consistent with the ALJ's RFC determination that Plaintiff "is able to stand and/or walk for about six hours and sit for about six hours in an eight-hour workday, but he would be permitted to alternate between sitting and standing every hour while at the workstation." (Tr. 62).

Plaintiff further argues that the VE's testimony that an individual could "primarily sit" while

16

performing the jobs is inconsistent with regulations describing light work. (Doc. 11 at 6–7). Light work involves lifting no more than twenty pounds occasionally and ten pounds frequently. 20 C.F.R. § 416.967(b). The regulations further provide that a job may be characterized as "light" on the basis that it involves a "good deal of walking or standing," or "*sitting most of the time* with some pushing and pulling of arm or leg controls." *Id.* (emphasis added).

Plaintiff says that the Dictionary of Occupational Titles ("DOT") classify the jobs the VE testified Plaintiff could perform as light exertion jobs. (Doc. 11 at 6). Because the jobs also "do not require any pushing or pulling of arm or leg controls[,]" Plaintiff says the jobs, per the regulations, necessarily require a "good deal of walking or standing." (*Id.* at 6–7). So, he says, the VE's testimony that the light jobs she identified allow an individual to "primarily sit" is inconsistent with the DOT and SSA regulations. (*Id.*).

Yet, the Court disagrees with Plaintiff's narrowly categorized description of light work. For one, the pushing and pulling of arm or leg controls is a type of exertional demand a light job can require which distinguishes it from a sedentary job, even when both types of jobs might otherwise require sitting most of the time. *See* SSR 83-10p, 1983 WL 31251, *5 (Jan. 1, 1983) ("A job is also in [the light] category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls which require greater exertion than in sedentary work[.]"). But there are similar kinds of exertional demands which distinguish a job as light work. And Plaintiff has not shown why the exertional demands contemplated by the VE's testimony are meaningfully distinct from the pushing and pulling example in the regulation.

Specifically, the VE testified that Plaintiff would be able to perform the jobs at the numbers identified so "long as [he was] able to lift 20 pounds[.]" (Tr. 107). The ability to lift twenty pounds is a key distinguishing feature of light work, as sedentary work cannot involve lifting more than

17

ten pounds. *Compare* 20 C.F.R. § 416.967(a) & (b). So, it stands to reason that a light job like Cashier II may be categorized as light work, even if it involves "primarily sitting," because it also demands the ability to lift twenty pounds.

Still more, the regulation describes lifting, walking or standing, or sitting while pushing and pulling arm controls as the criteria by which it measures an individual's ability to do "a full or wide range of light work[.]" 20 C.F.R § 416.967(b) ("To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."). The ALJ, in making his step five determination, noted that Plaintiff's "ability to perform all or substantially all of the requirements of this level of work" were impeded by additional limitations which "erode the unskilled light occupational base." (Tr. 70). In other words, the ALJ found Plaintiff capable of a reduced range of light work. So the Plaintiff's comparison of the VE's testimony, which describes a hypothetical individual capable of a reduced range of light work, to the regulation which describes the "full or wide range of light work," is not a fair one.

Simply put, Plaintiff has not demonstrated a clear inconsistency between the VE's testimony and the DOT and SSA regulations. And the VE's testimony logically discussed the hypothetical limitations that the ALJ and Plaintiff's attorney suggested, which were ultimately included in the RFC. The Court is thus able to engage in a meaningful review of the VE's testimony and its use by the ALJ at step five—and finds no error.

## IV. CONCLUSION

Based on the foregoing, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 11) and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.

Date: October 20, 2022

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE
